# 21-3077-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

SCOTT BRACK,

*Defendant,*

*and*

ELGIN BRACK,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

MURRAY E. SINGER, ESQ.
*Attorney for Defendant-Appellant*
14 Vanderventer Avenue, Suite 147
Port Washington, New York 11050
516-869-4207

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                    iv

STATUTES                                               v

STATEMENT OF JURISDICTION                              1

ISSUES PRESENTED                                       1

STATEMENT OF THE CASE                                  2

STATEMENT OF FACTS                                     2

    Introduction                                    2

    The Motion to Dismiss                           3

    The Motion to Suppress                          4

    The Evidence at Trial                           8

    Deliberations and Verdict                       18

    The Post Trial Motions                          18

    The Sentence                                    19

ARGUMENT

    POINT I

    THE GOVERNMENT FAILED TO
    ESTABLISH PROBABLE CAUSE FOR
    APPELLANT'S ARREST; THEREFORE,
    THE PROPERTY RECOVERED FROM

i

HIM AND FROM HIS BACKPACK SHOULD
BE SUPPRESSED.  U.S. CONST., AMEND. IV.                    19

POINT II

THE POLICE KNEW THAT APPELLANT
WAS THE OWNER OF THE BACKPACK
RECOVERED FROM THE BACK SEAT
OF THE CAR WHERE APPELLANT WAS
SEATED; AS SUCH, THEY LACKED
VALID CONSENT TO SEARCH THE
BACKPACK.  U.S. CONST., AMEND. IV.                    24

POINT III

THE GOVERNMENT FAILED TO
ESTABLISH THAT THE POLICE
CONDUCTED A VALID INVENTORY
SEARCH OF THE CAR AND ITS
CONTENTS.  U.S CONST., AMEND. IV.                    28

POINT IV

APPELLANT WAS DEPRIVED OF HIS
FEDERAL  CONSTITUTIONAL RIGHTS TO
DUE PROCESS OF LAW AND TO PRESENT
A DEFENSE BY THE DISTRICT COURT'S
REFUSAL TO PERMIT INTRODUCTION OF
A VIDEO SHOWING APPELLANT SIGNING
A DOCUMENT WITH HIS LEFT HAND.
U.S. CONST., AMENDS. V, VI.                    31

POINT V

APPELLANT'S CONVICTION UNDER COUNT
THREE MUST BE DISMISSED BECAUSE
ATTEMPTED HOBBS ACT ROBBERY, THE
PREDICATE FOR THE CRIME OF

DISCHARGING A FIREARM DURING A
CRIME OF VIOLENCE CHARGED IN
COUNT THREE, IS NOT A CRIME OF VIOLENCE.          37

CONCLUSION                                         38

TABLE OF AUTHORITIES

California v. Trombetta, 467 U. S. 479, 104 S.Ct. 2528 (1984)        33

Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973)        32-34

Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738 (1987)        28

Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142 (1986)        33

Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105 (1974)        32,34

Florida v. Wells, 495 U.S. 1, 110 S. Ct. 1632 (1990)        28-29

Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859 (1991)        21

Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793 (1990)        25

Otal Investments Ltd. v. M/V Clary, 673 F.3d 108 (2d Cir. 2012)        20

Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704 (1987)        34

Summers v. Senkowski, 2001 WL 204205 (S.D.N.Y. 2001)        36

United States v. Garcia, 413 F.3d 201 (2d Cir. 2005)        20

United States v. Griffiths, 47 F.3d 74 (2d Cir.1995)        29

United States v. Iodice, 525 F.3d 179 (2d Cir. 2008)        20-21

United States v. Lewis, 386 F.3d 475 (2d Cir.2004)        20

United States v. McGee, 564 F.3d 136 (2d Cir. 2009)        25

United States v. Mendez, 315 F.3d 132 (2d Cir. 2002)        29

United States v. Mohammed, 27 F.3d 815 (2d Cir. 1994)        36

United States v. Rodriguez, 368 Fed.Appx. 178 (2d Cir. 2010)     20

United States v. Singh, 415 F.3d 288 (2d Cir.2005)     20

United States v. Sparks, 287 Fed.Appx. 918 (2d Cir. 2008)     26

United States v. Taylor, 2022 WL 2203334 (2022)     37

United States v. Thompson, 29 F.3d 62 (2d Cir. 1994)     29

United States v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525 (1948) 20

Washington v. Texas, 388 U. S. 14, 87 S.Ct. 1920 (1967)     32-33

STATUTES

U.S. Const., Amend. IV     1,20,25,28

U.S. Const., Amend. V     1,32

U.S. Const., Amend. VI     1,32

18 U.S.C. §924(c)     2-3,18,37

18 U.S.C. §1951(a)     2-3,18

18 U.S.C. §3231     1

28 U.S.C. §1291     1

STATEMENT OF JURISDICTION

The District Court had jurisdiction over this case pursuant to 18 U.S.C.

§3231 because this case was a criminal case alleging violations of the laws of the

United States under Title 18 of the United States Code. This Court has jurisdiction

over this appeal pursuant to 28 U.S.C. §1291. A timely notice of appeal was filed

on behalf of appellant on December 17, 2021.

ISSUES PRESENTED

1. Whether the government failed to establish probable cause for appellant's arrest; therefore the property recovered from him and his backpack should be suppressed. U.S. Const., Amend. IV.

2. Whether the police knew that appellant was the owner of the backpack recovered from the backseat of the car where appellant was seated; as such, they lacked valid consent to search the backpack. U.S. Const., Amend. IV.

3. Whether the government failed to establish that the police conducted a valid inventory search of the car and its contents. U.S. Const., Amend. IV.

4. Whether appellant was deprived of his federal constitutional rights to due process of law and to present a defense by the District Court's refusal to permit introduction of a video showing appellant signing a document with his left hand. U.S. Const., Amends. V, VI.

5. Whether appellant's conviction under count three must be dismissed because Attempted Hobbs Act Robbery, the predicate for the crime of Discharging a Firearm During a Crime of Violence charged in count three, is not a crime of

1

violence.

## STATEMENT OF THE CASE

Elgin Brack (hereinafter referred to as appellant) appeals from a final judgment filed on December 6, 2021 in the United States District Court for the Eastern District of New York by the Hon. Eric N. Vitaliano, convicting him after trial of Hobbs Act Robbery Conspiracy in violation of 18 U.S.C. §1951(a) (Count 1), Attempted Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Count 2), Discharging a Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c) (Count 3), Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Counts 4, 6 and 8), and Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c) (Counts 5, 7 and 9), and sentencing him to concurrent terms of imprisonment of 144 months on counts 1, 2, 4, 6 and 8, and consecutive terms of imprisonment of 120 months on count 3 and 84 months on counts 5, 7, and 9, for a total term of imprisonment of 516 months, or 43 years, to be followed by supervised release for a term of three years.

## STATEMENT OF FACTS

Introduction

By indictment number 18-CR-684 (ENV), appellant was charged with Hobbs Act Robbery Conspiracy in violation of 18 U.S.C. §1951(a) (Count 1), Attempted Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Count 2), Discharging a

Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c) (Count 3),

Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Counts 4, 6 and 8), and

Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c)

(Counts 5, 7 and 9). The charges arose out of four separate incidents alleged to have

been committed by appellant and co-defendant Scott Brack in the early morning hours

of November 26, 2018 in Queens County, New York. Scott Brack pled guilty before

trial. On March 12, 2020, appellant was found guilty by jury verdict of all eight

counts. On December 1, 2021, appellant was sentenced to concurrent terms of

imprisonment of 144 months on counts 1, 2, 4, 6 and 8, and consecutive terms of

imprisonment of 120 months on count 3 and 84 months on counts 5, 7, and 9, for a

total term of imprisonment of 516 months, or 43 years, to be followed by supervised

release for a term of three years.

<u>The Motion to Dismiss</u>

By Notice of Motion dated October 3, 2019, defense counsel moved, <u>inter alia</u>,

to dismiss Count three of the indictment, charging Discharging a Firearm During a

Crime of Violence in violation of 18 U.S.C. §924(c), on the ground that the predicate

for that charge, Attempted Hobbs Act Robbery as charged in count two, was not a

crime of violence. (A. 38, 65)1. The District Court denied this motion (A. 379).

---

1Numbers preceded by "A." refer to the Appendix.

3

The Motion to Suppress

By Notice of Motion dated October 3, 2019, defense counsel moved, inter alia, to suppress physical evidence seized on November 26 , 2018 from a vehicle in which appellant was a passenger, and in particular from appellant's backpack, which had been found in the backseat of the vehicle where appellant had been seated, on the grounds that the arrest of appellant was without probable cause, the search of appellant's backpack was conducted without a warrant, and there was an improper inventory search of the vehicle (A. 38-39, 47).

A hearing was held before the Hon. Eric N. Vitaliano on December 18, 2019. The prosecution called two witnesses, NYPD Det. Wesley Ryan and retired NYPD Lt. Commander Keith Smith.  Det. Ryan testified that he was working as a robbery analyst in the Central Robbery Division on November 26, 2018 when he was assigned to assist on the investigation of four robberies of 24 hour commercial locations that had occurred overnight in Queens (A. 215-217).

Det. Ryan received by email two images of a car suspected to have been involved in the robberies (A. 217-219).  He recognized the car as a Toyota Solara and believed it was from model years 1999-2003 (A. 221, 226).  He then searched license plate reader (LPR) data for Solaras in Queens during the time frame of the robberies (H. 15).  He received 18 matches from 13 different cars (A. 223).  Det. Ryan then

4

narrowed his search by the number of matches and by the color of the car; based on the images he was looking for silver, gray or light tan (A. 224). Det. Ryan's search led him to focus on one car - a gray 2002 Toyota Solara with NY license plate HYC 8724 (A. 226-228). This was the only car with three matches on his LPR search, the most matches of any car (A. 227). Three additional cars had two LPR matches (A. 237).

Det. Ryan then reviewed a map showing the LPR matches and the locations of the robberies (A. 229). The LPR matches on the 2002 Solara were close in time and location to two of the robberies, and were consistent with driving from the location of the third robbery to the location of the fourth robbery (A. 229-231, 245-246).

Retired Lt. Commander Smith testified that on November 26, 2018 he was notified of the four robberies, and drove to the scene of the last robbery (A. 252). He watched security videos of the robberies, and viewed still photos taken from the videos (A. 252). It appeared that the same perpetrator had committed each of the robberies, and was seen getting into a car (A. 254, 256). The car appeared to be silver or gray and had a reddish air freshener in the windshield (A. 256-257).

Retired Lt. Smith was provided the results of Det. Ryan's LPR investigation, including the information regarding a gray Toyota Solara with NY license plate HYC 8724 (A. 259-260). That car had previously been the subject of a 311 call near

Hughes Avenue in the Bronx, and an LPR hit showed the car crossing the George Washington Bridge from New Jersey into New York (A. 264). A surveillance team thereafter found the car unoccupied on Hughes Avenue in the Bronx at approximately 8:00 p.m. on the evening of November 26, 2018 (A. 264). It appeared to be the same car from the robberies, and had a red air freshener on the windshield mirror (A. 264-265).

The surveillance team saw people get into the car that same evening (A. 266). As the car attempted to drive away, it was stopped and three adults were removed from the car (A. 266-267). According to retired Lt. Smith, he recognized the face of appellant as the perpetrator on the videos, and testified that he told this to Det. Finbar Fleming (A. 267-268, 290, 292).

Retired Lt. Smith could not recall what appellant was wearing when he was removed from the car and taken into custody (A. 267, 271). He agreed that in the photos from the videos of the robberies, the perpetrator was wearing a hood, covering his hair, forehead and hairline, and that he had a drawstring across his mouth (A. 270-271). Appellant had long dreadlocks that extended below his chin (A. 273, 289). Retired Lt. Smith also acknowledged that there was no document or indeed any NYPD paperwork that indicated that he had immediately recognized appellant as the perpetrator (A. 275). The only time this claim appeared was in his testimony at the

hearing (A. 275).  Det. Finbar Fleming did not testify at the hearing.

Retired Lt. Smith testified that the three men taken from the car were handcuffed and transported back to his office (A. 268).  The car was also taken back to his office, where an inventory search was conducted (A. 268).  The questions asked of retired Lt. Smith regarding an inventory were as follows:

> Q What happened to the car after it was brought back to your office?
>
> A The car was inventoried.
>
> Q Did the ATF have a policy that requires inventories?
>
> A Yes.
>
> Q Does NYPD also have a policy that requires inventories?
>
> A Yes.
>
> Q And does SPARTA, as a matter of its regular practice, inventory cars that are taken into custody?
>
> A Yes. (A. 268-269).

No testimony or other evidence was offered either that there was a policy or any specifics as to what the policy permitted or required.

Appellant testified on his own behalf, and described the circumstances of his stop and arrest (A. 311-337).

In a post-hearing memorandum, defense counsel argued that appellant's arrest

7

was illegal as the credible evidence was insufficient to establish probable cause that appellant had been involved in any of the robberies (A. 352-363). Specifically, defense counsel argued that in the absence of any other testimony or evidence, the claim by retired Lt. Smith that he had recognized appellant at the scene of the car stop was not credible (A. 355-362). Finally, defense counsel argued that in the absence of any evidence regarding actual policies for an inventory search, the search of the car was improper (A. 362-363).

In a decision dated January 28, 2019, the District Court denied the motion to suppress (A. 408). The court found that the car was properly seized, that, based on retired Lt. Smith's testimony, there was probable cause to arrest appellant, and that even if there was no probable cause for appellant's arrest, the evidence recovered from the car was not the fruit of his arrest (A. 415-422). Finally, the court denied the motion to suppress the evidence recovered from the car because the driver had consented to the search, had apparent authority to do so, and, in any event, the property would inevitably have been discovered through an inventory search of the car (A. 422-424).

The Evidence at Trial

The trial evidence established that four incidents took place in the early morning hours of November 26, 2018, one attempted robbery and three robberies.

8

The principal issue at trial was the identity of appellant as the perpetrator. No victim identified appellant.

Alejandro DeLeon was a manager at a Duane Reade store at 60-02 Roosevelt Avenue in Queens, New York (A. 738). At approximately 3:30 a.m. on November 26, 2018, a man entered the store and demanded money (A. 741). According to Mr. DeLeon, the man was about 23 years old (A. 741). The man wanted money, but Mr. DeLeon closed the cash drawer (A. 741). The man shot Mr. DeLeon. Security videos showing the incident were entered into evidence (A. 658). The parties stipulated that no money was taken during the course of this attempted robbery (A. 1487).

Police Officer Ryui Wang responded to 60-02 Roosevelt Avenue, where he found Mr. DeLeon on the sidewalk, bloody from gunshot wounds to his hand and head (A. 634-635). P.O. Wang looked inside the store and saw a lot of blood by the cash register, on the floor and the wall (A. 648). He then accompanied Mr. DeLeon in the ambulance to Elmhurst General Hospital (A. 644-645). Mr. DeLeon suffered significant and life-threatening injuries from the gunshot wounds to his hand and head (A. 655-656).

Detective Jerry St. Louis testified that he was a member of the NYPD's Crime Scene Unit, and went to the Duane Reade at 60-02 Roosevelt Avenue on November 26, 2018 (A. 660-661, 665). Det. St. Louis reviewed security video of the incident in

the store, which showed a perpetrator enter the store, hold a bag of Skittles, appear to have a conversation with Mr. DeLeon, shoot Mr. DeLeon, struggle with Mr. DeLeon, then shoot Mr. DeLeon again (A. 670-673). The perpetrator held and shook the bag of Skittles with his right hand, and took out and held the gun with his right hand (A. 715-716). After the shots were fired, the perpetrator fled the scene (A. 673).

Det. St. Louis recovered bullet fragments from the scene, and saw footprints in the blood on the floor of the store (A. 676-677). Det. St. Louis later recovered Mr. DeLeon's belt and shoes (A. 722-723). He noted that there was blood on the belt, but did not note that there was any blood on the shoes (A. 723).

Anjan Saha worked as a cashier at a 7-11 store at 50-92 Northern Boulevard in Queens, New York (A. 744). Mr. Saha testified that at approximately 3:55 a.m. on November 26, 2018, a young man who appeared to be 18 or 19 years old entered the store, held a gun to his head, and stole a cash register tray containing $200 to $300 (A. 746-750, 755). The perpetrator took the gun out with his right hand (A. 754). Security videos showing the robbery were entered into evidence (A. 658, 744). The parties stipulated that approximately $300 was taken during the course of this robbery (A. 1487).

Sharon Sanchez was a cashier at a Rite Aid store at 33-01 30th Avenue in Queens, New York (A. 778). Ms. Sanchez testified that at approximately 4:15 a.m.

10

on November 26, 2018 a black man in his twenties and wearing a hoodie displayed a gun and told her to give him all of the money in the cash register (A. 782-792). The man took the till from the cash register and cash and left the store (A. 783-784, 789, 791-792, 796). According to Ms. Sanchez, the man's hoodie covered most of his face (A. 793-794). He spoke with no accent (A. 796). Ms. Sanchez also testified that the perpetrator took the gun out of his right front pants pocket with his right hand (A. 806). Security videos showing the robbery were entered into evidence (A. 658-659). The parties stipulated that approximately $802.17 was taken during the course of this robbery (A. 1487).

Detective Julie Casale testified that she was a member of the NYPD's Crime Scene Unit, and went to the Rite Aid at 33-01 30th Avenue on November 26, 2018 (A. 808-809). Det. Casale reviewed security videos from inside and outside the store (A. 812-813, 829). The videos showed a man, believed to be the perpetrator (because he was wearing the same clothing as the perpetrator - white sneakers, dark pants, a dark jacket, and a hoodie), get out of the passenger door of a car and drop something in a dumpster (A. 813-814, 820). A cash register drawer was found inside the dumpster (A. 821, 824).

Gaspar Pena was an assistant manager at a Rite Aid store at 115-10 Merrick Avenue in Queens, New York (A. 838-839). Mr. Pena testified that at approximately

11

5:00 a.m. on November 26, 2018 a man put a Snickers bar on the counter, pointed a gun at him, and ordered Mr. Pena to give him money (A. 841-843). Mr. Pena gave the man the cash register drawer containing money and the man left the store (A. 843). According to Mr. Pena, the man was between 18 and 25 years old and had a moustache (A. 847). Security videos showing the robbery were entered into evidence (A. 659). The parties stipulated that approximately $200 was taken during the course of this robbery (A. 1487).

The parties stipulated that the attempted robbery and robberies of the four stores had an actual or potential effect on interstate and foreign commerce, or the movement of goods in interstate and foreign commerce (A. 854-855).

At approximately 7:00 p.m. on November 26, 2018, the police located a silver Toyota Solara on Hughes Avenue in the Bronx (Sgt. Keith Bryan: A. 879-880). About one and one-half hours later, a black man, identified as appellant, was seen walking towards the car carrying a gray knapsack, and got into the back seat of the car (A. 884-885, 898, 901-903). Sgt. Bryan was communicating with the other members of the field team by point-to-point radio during this one and one-half hour period (A. 898). Shortly thereafter, two other men entered the car and it began to drive off (A. 885-886). The police stopped the car and removed the men from the car (A. 886, 904-906). A multi-colored gray knapsack, identified as the knapsack appellant carried to

the car, was on the floor in the backseat (A. 892-893). The three men were handcuffed and taken in a police van to an ATF office in the Bronx (A. 906-908). The car was driven to the ATF office by Det. Finbarr Fleming (A. 908).

Det. Thomas Nuzio responded to the garage at the ATF office in the Bronx and participated in the search of the car (A. 923, 1005). In particular, he was responsible for the search of appellant's backpack, which he first saw on the hood of the car in the ATF garage (A. 926, 1007). The backpack contained clothing, a firearm and a wallet (A. 927, 929, 933, 1009). The clothing consisted of a yellow shirt, a multi-colored pair of underwear, three pair of jeans (one with a belt), and two sandals (A. 928, 943, 1009). The firearm was a revolver containing three fired rounds and three live rounds (A. 931). The wallet contained an identification card in the name of appellant (A. 941). Det. Nuzio wore one pair of gloves as he handled all of the items in the backpack (A. 1009-1010).

Special Agent Tyler Miceli was assigned on November 26, 2018 to work on the investigation of these four incidents (A. 1035). He was at the ATF office in the Bronx on the evening of November 26, 2018 when appellant and the other two men, and the car, were brought to the office (A. 1037-1038). He participated in the search of the car, specifically the passenger side of the rear seat (A. 1051). S.A. Miceli testified that he found appellant's backpack, a green hooded jacket, and a cell phone (A. 1052-

1053, 1060, 1066). The car was searched further by other agents, including Det. Nuzio (A. 1054). Det. Nuzio gave S.A. Miceli appellant's backpack, a yellow t-shirt, two pairs of jeans, flip flops, a pair of black pants with golden zippers, a wallet, and a firearm (A. 1055-1057, 1059, 1068). Appellant had a wallet containing a North Carolina identification card in appellant's name, purple earphones, a toothbrush, a cigar wrapper, and paycheck stubs from the New York City Parks Department on him when he was arrested (A. 1064-1066, 1122-1123). S.A. Miceli testified that he also recovered security video from Hughes Avenue from approximately 3:00 p.m. on November 25, 2018 showing appellant wearing the clothing seen on the perpetrator of the robberies (A. 1073-1081). S.A. Miceli acknowledged that over $6000 in cash was recovered on the night of the arrests, and over $5000 was returned to appellant (A. 1096-1097). On the night of his arrest, appellant was wearing white sneakers, as was the perpetrator, but the sneakers were not seized nor was any testing done to determine if there was blood on them (A. 1104-1106). No gloves were recovered from the car (A. 1107).

Defense counsel sought to introduce into evidence a portion of a video of appellant taken while he was in police custody on the evening of November 26, 2018 (A. 994-995, 1437-1439, 1482, 1506). In this regard, S.A. Miceli testified as follows:

> Q: Now, you were -- had a chance to observe Elgin Brack after he was arrested on the evening of November 26th,

14

2018 --

A: Yes.

Q: -- correct? And did there come a time during the course of when he was in your presence that you asked him to sign a document?

A: Yes.

Q: And as you sit here now, do you remember with which hand he signed a document?

A: His left hand (A. 1130).

Counsel sought to introduce, without sound, the portion of the video where appellant was handed a pen in his right hand to sign a document, moved the pen to his left hand, which was handcuffed, and signed the document with his left hand (A. 994-995, 1437-1438, 1482). This evidence was intended to demonstrate that appellant was left handed, whereas the perpetrator had been seeing holding the firearm with his right hand (A. 994, 1438, 1482, 1506). The District Court denied the application, ruling that the potential prejudice and confusion from this evidence outweighed its probative value (A. 995), that the evidence was not relevant (A. 1506), and that it was cumulative, as the agent had testified that appellant signed the document with his left hand (A. 1506).

The firearm in appellant's backpack was a .357 revolver, recovered with three fired cartridges and three unfired cartridges (Det. Michael Nolan: A. 1156, 1168). The

firearm was operable (A. 1155). Det. Jonathan Fox testified that he compared the bullets recovered from the shooting of Alejandro DeLeon, the casings from the firearm, and the test fires from the firearm (A. 1230). The casings and the test fires were fired from the same gun (A. 1245). The bullets recovered from the shooting of Alejandro DeLeon were fired from the same gun as the test fires (A. 1249).

Jessica Tarry, a criminalist with the NYPD, swabbed the firearm for DNA, and send the swabs to the Office of the Chief Medical Examiner for analysis (A. 1262, 1271-1274). Matthew Goldstein, a criminalist with the Office of the Chief Medical Examiner, examined the swabs, and a DNA sample obtained from appellant, and determined that there was a mixture of DNA from three people on the grip of the firearm (A. 1295-1296, 1319-1321). One donor contributed 94% of the DNA to the mixture, and that person's DNA matched appellant (A. 1326). Mr. Goldstein acknowledged that he could not say how appellant's DNA got on the grip of the gun, and recognized the concept of secondary transfer, where a person's DNA could appear on an object that was never touched by the person (A. 1342-1343).

Special Agent Seth Mastropaolo of the ATF extracted data from the cell phone recovered from the back seat of the car (S.A. Miceli: A. 1066-1067; S.A. Mastropaolo: A. 1362, 1364). The subscriber of the phone was appellant, and activity on the phone was associated with an email address of elginbrack5@gmail.com (A.

16

1369; David Magnuson: A. 1401). On November 26, 2018 between 2:34 a.m. and 4:47 a.m. there were 27 internet searches for 24 hour stores in Queens (A. 1371-1372). A map showing cell towers used by appellant's phone during the time frame of the robberies and the addresses of the four robbery sites was introduced into evidence (David Magnuson: A. 1402).

Daphne Mavris, an NYPD criminalist, was called by the defense, and testified that she did a visual inspection of the black pants recovered from the car (and alleged to be the pants worn by the perpetrator) and there were no blood stains on the pants (A. 1487-1489).

Det. Finbarr Fleming was called by the defense, and testified that he was a member of the team that stopped the car and took appellant and the other two men into custody on the evening of November 26, 2018 (A. 1494). Retired Lt. Smith and other officers were at the scene of the car stop (A. 1494). He took appellant out of the car and handed him off to other detectives (A. 1495). He later drove the car to the ATF office (A. 1495). Det. Fleming saw a knapsack and some clothing in the back seat (A. 1496). He was not asked, and did not testify, whether retired Lt. Smith stated that he recognized appellant as the perpetrator.

Appellant testified on his own behalf, and denied any participation in the charged crimes (A. 1498-1526).

17

Deliberations and Verdict

The jury began deliberations on March 11, 2020 (A. 1595). In its first note, the jury asked to see videos and photos, and asked, "Can we see the weapon used?" (A. 1596). The gun was handed to jurors in order for them to be able to see and feel it (A. 1598).

On March 12, 2020, in its second day of deliberations, the jury returned its verdict (A. 1648-1670). The jury found appellant guilty of Hobbs Act Robbery Conspiracy in violation of 18 U.S.C. §1951(a) (Count 1), Attempted Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Count 2), Discharging a Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c) (Count 3), Hobbs Act Robbery in violation of 18 U.S.C. §1951(a) (Counts 4, 6 and 8), and Brandishing a Firearm During a Crime of Violence in violation of 18 U.S.C. §924(c) (Counts 5, 7 and 9)(A. 1648-1670).

The Post-Trial Motion

By Notice of Motion dated April 17, 2020, defense counsel moved, inter alia, for a new trial on the ground that the District Court had "erroneously excluded evidence [the video of appellant signing a document with his left hand] which violated the defendant's constitutional right to present a defense," (A. 1684), and to reopen the suppression hearing based on testimony at the trial which established that the police

had seen appellant carry the backpack to the car (A. 1687, 1693, 1732-1733). The motion was denied by Memorandum and Order dated November 22, 2020 (A. 1737).

The Sentence

On December 1, 2021, appellant was sentenced to concurrent terms of imprisonment of 144 months on counts 1, 2, 4, 6 and 8, and consecutive terms of imprisonment of 120 months on count 3 and 84 months on counts 5, 7, and 9, for a total term of imprisonment of 516 months, or 43 years, to be followed by supervised release for a term of three years. (A. 1785-1788).

ARGUMENT

POINT I

THE GOVERNMENT FAILED TO ESTABLISH PROBABLE CAUSE FOR APPELLANT'S ARREST; THEREFORE, THE PROPERTY RECOVERED FROM HIM AND FROM HIS BACKPACK SHOULD BE SUPPRESSED. U.S. CONST., AMEND. IV.

Probable cause for appellant's arrest relied on a claim by one witness, retired Lt. Keith Smith, that he recognized appellant as the perpetrator. This single claim found no support in any other evidence in the case - it did not appear in any police document and was not supported by a single one of the many officers at the scene of the car stop. At the time of the claimed recognition of appellant, appellant was not wearing the clothing worn by the perpetrator, and retired Lt. Smith had only viewed

19

security video and stills from the robberies - evidence that he acknowledged showed the perpetrator wearing a hood that covered his hair, forehead and hairline, with a drawstring over his mouth. Notably, not one of the four victims of the robberies was able to, or even tried to, identify appellant as the perpetrator. Under these circumstances, the hearing court's acceptance of this single unsupported and self-serving claim was clearly erroneous. The remaining evidence was insufficient to support a finding of probable cause to arrest appellant, search him or his backpack, or keep possession of any of his property. U.S. Const., Amend. IV.

In United States v. Rodriguez, 368 Fed.Appx. 178, 179 (2d Cir. 2010), this Court stated that "[i]n an appeal of a suppression decision, we review a district court's legal determinations de novo and its factual determinations for clear error. See, e.g., United States v. Singh, 415 F.3d 288, 293 (2d Cir.2005); United States v. Lewis, 386 F.3d 475, 480 (2d Cir.2004)." A clearly erroneous finding is one where "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Iodice, 525 F.3d 179, 185 (2d Cir. 2008) quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948). See Otal Investments Ltd. v. M/V Clary, 673 F.3d 108, 113 (2d Cir. 2012). See also United States v. Garcia, 413 F.3d 201, 221-222 (2d Cir. 2005)(noting that the Supreme Court "has approved the clearly

erroneous standard for findings of fact in criminal cases on issues other than those that determine guilt", *citing* Hernandez v. New York, 500 U.S. 352, 365–66, 111 S.Ct. 1859, 1869 (1991)).  "Strong deference" is to be given to a district court factual decision.  United States v. Iodice, supra, 525 F.3d at 185.

The District Court's finding - that the officer recognized appellant - was clearly erroneous.  The "mistake" that was made was not whether the claimed recognition was accurate.  That is irrelevant.  Rather, the mistake was in crediting the claim of recognition at all.

Consider the circumstances.  The perpetrator's hair, forehead and hairline were covered during the incidents, and he had a drawstring across his mouth.  The actual victims, who were face to face with the perpetrator, were not able to make an identification, and were not even asked to try.  Retired Lt. Smith did not see the actual perpetrator live.  His only look at the perpetrator was from security videos, and stills taken from the videos.  He saw only a man on a screen with his hair, forehead and hairline covered, and a drawstring across his mouth.

When he did encounter appellant live, a number of hours later, appellant was not wearing clothing similar to that worn by the perpetrator, and had dreadlocks down to his chin.  How would it be possible to instantly recognize someone under these circumstances?  He didn't, and his claim otherwise is simply not credible.

There are additional bases for finding that retired Lt. Smith's claim is not credible.  Again, consider the circumstances.  Retired Lt. Smith was part of the leadership of a team of officers stopping a car believed to have been involved in multiple gunpoint robberies 15 hours earlier.  He was present when three men, including appellant, were removed from the car.  No one knew who these men were, whether they were involved in the robberies, or whether they were armed.  If, as claimed, retired Lt. Smith recognized appellant as the man in the videos with a gun who had shot one of the victims, wouldn't he have said something ("hey, that's the guy!")?  There is no evidence that he did so.  At the moment of claimed recognition, other officers were taking the man out of the car.  Retired Lt. Smith claimed to have told Det. Fleming immediately, but Det. Fleming, who later testified at trial as a defense witness, was not called at the hearing and never corroborated retired Lt. Smith's claim.  Even when testifying at the trial, Det. Fleming was never asked whether he had heard retired Lt. Smith say anything.  Moreover, not one of the many other officers at the scene claimed to have heard retired Lt. Smith say anything.  If in fact retired Lt. Smith recognized appellant at the scene, surely someone would have heard him say so or known about it.

Finally, retired Lt. Smith's claimed recognition fails another common sense test - there was not a single mention of this claim in any note, report, memorandum, or

22

other paperwork prepared either by retired Lt. Smith or any other member of law enforcement. This was the single most important, and most contested issue, in this case - whether appellant was the perpetrator. There was no issue as to whether the incidents took place. Yet neither retired Lt. Smith nor any other officer, in the numerous police reports prepared about the incidents, the arrests, the searches, or any other police work done in conjunction with this case, makes a single mention of this significant claim. It is simply not credible, should not have been credited by the District Court, and should not be credited by this Court. Absent this claim, as the District Court appeared to recognize, the police lacked probable cause to arrest appellant.

The District Court also ruled that even if the officers lacked probable cause for appellant's arrest, suppression of the property recovered from appellant's backpack would still be denied because the search of the backpack did not flow from the arrest but from its presence in the car at the time the car was seized. It was and is appellant's contention that absent a warrant authorizing a search of the backpack, there was no other legal basis to search appellant's property. In particular, appellant contends that there was no valid consent to search the backpack and there was no proper inventory search of the car, the two legal bases relied on by the District Court to uphold the legality of the search. These issues will be discussed in Points II and II, <u>infra</u>. We

would note that at the time of the hearing, it was not known to defense counsel that the police had seen appellant carrying the backpack when he got into the car and therefore knew that the backpack belonged to him. Retired Lt. Smith testified at the hearing only that officers had seen three men get into the car. Defense counsel's post-trial motion sought to reopen the hearing so as to, inter alia, shed further light on the police knowledge of this critical fact and the legal implications that flowed from it.

We therefore urge this Court to find clear error in the District Court's crediting of retired Lt. Smith's claim to have recognized appellant, to find that the police lacked probable cause to arrest appellant and to search and keep his property, and, as a result, to order that the property recovered from appellant's backpack be suppressed.

POINT II

THE POLICE KNEW THAT APPELLANT WAS THE OWNER OF THE BACKPACK RECOVERED FROM THE BACK SEAT OF THE CAR WHERE APPELLANT WAS SEATED; AS SUCH, THEY LACKED VALID CONSENT TO SEARCH THE BACKPACK. U.S. CONST., AMEND. IV.

Police officers saw appellant walk to the car on Hughes Avenue carrying a backpack and get into the car. That same backpack was later removed from the car and searched by the police without first obtaining a warrant. The government contends that the police had apparent authority to search appellant's backpack based on the consent of the driver of the car, who was a relative of the registered owner of

24

the car.  But the driver did not have the authority to consent to the search of appellant's property, and the police knew that, because they knew that the backpack belonged to appellant.  Under these circumstances, it was not reasonable for the police to believe that the driver had the authority to consent to a search of appellant's bag.  The contents of the backpack should have been suppressed.  U.S. Const. Amend. IV.

In Illinois v. Rodriguez, 497 U.S. 177, 179, 110 S.Ct. 2793, 2796 (1990), the Supreme Court determined that a warrantless search based on the consent of a third party may be valid, but only if the police "reasonably believe[d]" that the person giving consent had the authority to do so.  "[R]easonableness" does not require that the police be factually correct, but it does require that they act in a reasonable manner under the circumstances, i.e. "would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority" to authorize the search.  Id. at 184, 188, 110 S.Ct. at 2799, 2801.  Whether a third party has the authority to consent to a search of particular property "is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably."  Id. at 186, 110 S.Ct. at 2800.  See United States v. McGee, 564 F.3d 136, 139 (2d Cir. 2009)(third party consent may validate a warrantless search only if the police reasonably believed that the third party possessed the authority to consent

25

to the search).

In United States v. Sparks, 287 Fed.Appx. 918, 920 (2d Cir. 2008), the question before the Court concerned whether the driver of a car who produced rental papers for the car had the authority to consent to the search of a bag on the floor behind him. The Court found that "[o]n the specific facts of this case, it was reasonable for the arresting officer to believe that [the driver], who was driving and produced rental papers for the car, had such authority." Id. However, the Court noted that "[t]he reasonableness of this belief could have been dispelled if, for example, either [the owner of the bag or the driver] had indicated that the Tote Bag behind [the driver's] seat" belonged to the owner and not the driver. Id. This Court further stated that "consent to search a particular location does not automatically extend to all closed containers within that location." Id. It still must be "objectively reasonable" under the circumstances for a police officer to believe that the scope of consent include permission to search a particular container. Id.

This case presents precisely the situation posited by this Court in Sparks, where the Court questioned whether a driver's consent to search would extend to a bag in a car that the police were told belonged to another person in the car. The police here relied on the consent to search the car, given by the driver of the car, to search a backpack which had been recovered from the back seat. But, unlike the situation in

26

Sparks, the police here saw appellant carry the backpack to the car, and recovered the backpack from the backseat, where appellant had been sitting. Under these circumstances, it was not objectively reasonable for the police to believe that the driver of the car had the authority to consent to the search of appellant's bag. How could it be? The police saw appellant, alone, with the backpack, walk to the car and get into the back seat. The driver, who walked to the car separately, did not have and was never seen with the backpack.

We would note again that at the time of the hearing, it was not known to defense counsel that the police had seen appellant carrying the backpack when he got into the car and therefore knew that the backpack belonged to him. Retired Lt. Smith testified only that officers had seen three men get into the car. Defense counsel's post-trial motion sought to reopen the hearing so as to, inter alia, shed further light on the police knowledge of this critical fact, which only became known at trial, and the legal implications that flowed from it. However, the police did not have a warrant to search appellant's backpack and, as the trial testimony now makes clear, it was not objectively reasonable under the circumstances for the police to rely on the driver's consent to search appellant's backpack. We therefore urge this Court to find that the warrantless search of appellant's backpack violated his Fourth Amendment right to be free from an unreasonable search, and suppress the property recovered from

appellant's backback.

POINT III

THE GOVERNMENT FAILED TO ESTABLISH THAT
THE POLICE CONDUCTED A VALID INVENTORY
SEARCH OF APPELLANT'S BACKPACK.    U.S
CONST., AMEND. IV.

Retired Lt. Smith testified that the NYPD had a policy requiring inventories of

cars taken into custody, and it was the regular practice of his unit to inventory cars

taken into custody.  He also testified that it was the policy of the ATF to require

inventory searches of cars taken into custody.  However, no testimony and no

evidence was introduced to establish what the policies regarding inventory searches

were, or whether those policies were complied with in the instant search.  Absent

evidence as to either the contents of the policy or that the policy was complied with,

the government's proof failed to establish the existence of a valid inventory search of

appellant's backpack, the alternate rationale offered by the District Court for denying

suppression.  On this basis, too, the contents of the backpack should be suppressed.

U.S. Const., Amend. IV.

The Supreme Court has long recognized that inventory searches are a

"well-defined exception to the warrant requirement of the Fourth Amendment."

Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738, 741 (1987).  Three years after

Bertine, however, in Florida v. Wells, 495 U.S. 1, 110 S. Ct. 1632 (1990), the

Supreme Court addressed its concern that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Id. at 3, 107 S.Ct. at 1635. "[S]tandardized criteria" or an "established routine . . . must regulate the opening of containers found during inventory searches." Id. As stated by the Supreme Court in Florida v. Wells, Id. at 4-5, 107 S.Ct. at 1635, "the Supreme Court of Florida found that the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search. We hold that absent such a policy, the instant search was not sufficiently regulated to satisfy the Fourth Amendment."

This Court, too, has emphasized that "the right to [make an] inventory ... does not carry in its wake unlimited discretion." United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002), *quoting* United States v. Griffiths, 47 F.3d 74, 78 (2d Cir.1995). Rather, "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to 'standardized criteria ... or established routine,' " Id., *quoting* United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994), or, as the Court stated, pursuant to "established" or "standardized" procedures. United States v. Mendez, supra, 315 F.3d at 138. The burden is on the government to prove the existence of such procedures or practices. Id. at 137. See United States v. Thompson, supra, 29 F.3d at 65 ("The existence of such a valid procedure may be

29

proven by reference to either written rules and regulations, [citation omitted], or testimony regarding standard practices.").

The full extent of the evidence produced by the government at the hearing to support the validity of the warrantless search of appellant's backpack as part of an inventory was the following questions of retired Lt. Smith:

> Q What happened to the car after it was brought back to your office?
>
> A The car was inventoried.
>
> Q Did the ATF have a policy that requires inventories?
>
> A Yes.
>
> Q Does NYPD also have a policy that requires inventories?
>
> A Yes.
>
> Q And does SPARTA, as a matter of its regular practice, inventory cars that are taken into custody?
>
> A Yes.

No other testimony or evidence was offered at the suppression hearing to describe any of the policies referenced by the witness, what the policies mandated or required as to when or how an inventory was to be conducted, or whether the policies, whatever they may have been, were followed.

A simple statement that it is policy to conduct an inventory search of a car does

not establish the "standardized criteria" or "established routine" necessary to validate a warrantless search of a closed container within a car. Again, the concern, as outlined by the Supreme Court, is that a purported inventory search not "be a ruse for a general rummaging in order to discover incriminating evidence." And in order to overcome that concern, the government is required to prove both that there exist procedures and practices sufficient to justify this exception to the warrant requirement, and that those procedures and practices were followed for the search at issue. Only then can the Court be satisfied that a defendant's fundamental Fourth Amendment rights have been protected.

The government wholly failed to establish that the warrantless search of appellant's backpack was justified under the inventory exception to the Fourth Amendment. As such, the property recovered from appellant's backpack should be suppressed.

POINT IV

APPELLANT WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND TO PRESENT A DEFENSE BY THE DISTRICT COURT'S REFUSAL TO PERMIT INTRODUCTION OF A VIDEO SHOWING APPELLANT SIGNING A DOCUMENT WITH HIS LEFT HAND. U.S. CONST., AMENDS. V, VI.

The principal issue at trial was the identity of appellant as the perpetrator of the

31

charged crimes.  Security videos of the incidents clearly showed that the perpetrator held and fired a gun with his right hand.  Defense counsel sought to show the jury a video of appellant, without sound, taken while in police custody, that showed appellant was handed a pen in his right hand to sign a document and moved it to his left, handcuffed hand to sign.  The Court denied the request, stating that it could confuse the jury to show appellant in custody with officers and, since there was police testimony that appellant was left-handed, the video showing appellant signing a document with his left hand would be cumulative.  The District Court's preclusion of the video offered by the defense to demonstrate a fact central to the principal issue before the jury deprived appellant of his constitutional rights to due process of law, to confront his accusers, and to present a defense. U.S. Const., Amends. V, VI.

There can be no dispute that appellant has a constitutional right to present a defense.  Whether rooted directly in the Due Process Clause of the Fifth Amendment, Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973)(the right to call witnesses favorable to the defense), or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, Washington v. Texas, 388 U. S. 14, 87 S.Ct. 1920 (1967)(the right to compel testimony favorable to the defendant); Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105 (1974)(defendant must be allowed to effectively cross¬ examine witnesses), the Constitution guarantees criminal defendants "a

meaningful opportunity to present a complete defense." California v. Trombetta, 467 U. S. 479, 485, 104 S.Ct. 2528, 2532 (1984); Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146-2147 (1986)(defendant may introduce evidence of involuntariness of his confession to show that it is unworthy of belief).

Indeed, the right to present a defense is a fundamental component of due process of law. Chambers v. Mississippi, supra, 410 U.S. at 294, 93 S.Ct. at 1045. "[D]ue process is, in essence, the right to a fair opportunity to defend against the State's accusations." Id. Chambers concerned a defendant who was precluded by state evidentiary rulings from cross-examining a hostile defense witness who had confessed to the crime for which defendant was on trial, and from calling other witnesses to confessions by the witness. Id. at 295, 298, 93 S.Ct. at 1045-1047. In reversing Chambers conviction, the Supreme Court stated that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Id. at 302, 93 S.Ct. at 1049. The Court further stated that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id.

The Court has discussed other circumstances where State rules restricting evidence violate a defendant's fundamental due process right to present a defense. For instance, Washington v. Texas, supra, 388 U. S. at 14-15, 87 S.Ct. at 1921,

33

involved a state law prohibiting a coparticipant in crime from testifying for the defense. The Court ruled that the right to present "relevant and material" evidence that was "vital to the defense" was a "fundamental element of due process of law." Id. at 16, 19, 87 S.Ct. at 1922-1923. Davis v. Alaska, supra, 415 U.S. at 30, 94 S.Ct. at 1107, concerned a state law that prevented impeachment of a prosecution witness with the witness's juvenile record. The Court ruled that the law violated the defendant's fundamental right to confront the witnesses against him. Id. at 315, 94 S.Ct. at 1110. Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704 (1987) concerned a per se rule barring a defendant's hypnotically refreshed testimony. In overruling the state rule, the Court stated that due process required the "right to be heard and to offer testimony." Id. at 51, 107 S.Ct. at 2709. And Chambers v. Mississippi, supra, discussed above, involved what the Supreme Court found to be a "mechanistic" application of the hearsay rule to keep out testimony helpful to the defendant. 410 U.S. at 302, 93 S.Ct. at 1049. Evidentiary rulings will be upheld only if they are neither "arbitrary [n]or disproportionate to the purposes they are designed to serve." Rock v. Arkansas, supra, 483 U.S. at 56, 107 S.Ct. at 2711.

The District Court's refusal to permit appellant to introduce a video showing him struggling to sign a document with his left hand deprived appellant of the clearest and most effective way of demonstrating to the jury that he could not have been the

perpetrator because he was left handed.  As stated above, the principal issue at trial was the identity of appellant as the perpetrator of the charged crimes.  Appellant sought to establish that he is left-handed in support of his defense that he was not the perpetrator, who, as clearly reflected in video surveillance depicting the actual commission of the offenses, was right-handed.  The instinctive use of his left hand in the video was therefore relevant and material, and vital, to appellant's defense.

S.A. Miceli's testimony on direct examination that appellant signed a document while in police custody with "his left hand" is hardly a substitute for the compelling demonstrative evidence the defense sought to show to the jury.   The video would have been far more revealing and substantive than the few words introduced by the prosecution.   Moreover, the defense should not have been hamstrung by the prosecution's presentation where there was a far more compelling method to inform the jury on this critical fact.

The District Court excluded this evidence as confusing, prejudicial and cumulative.  These concerns were easily resolved.  The jury had already been told that appellant signed a document while in police custody.  Showing the video, without sound, as proposed by the defense, merely showed what had already been discussed in testimony.  A simple curative instruction to consider the video for the limited purpose for which it was introduced could easily have resolved any concern about

questions the jury may have had about the circumstances under which the video was taken.  The District Court's additional concern that the proffered evidence was cumulative is difficult to understand.  Again, the only evidence introduced on this critical issue was the testimony of a single witness that appellant signed a document with his left hand.  Demonstrative evidence to make the same point can hardly be considered cumulative, and certainly not to the point that appellant's fundamental constitutional rights are abridged.  The government has been allowed to offer photographs under similar circumstances.  See United States v. Mohammed, 27 F.3d 815, 822 (2d Cir. 1994)(arrest photograph of defendant wearing a black jacket similar to a black jacket previously observed corroborated prior testimony).  See also Summers v. Senkowski, 2001 WL 204205, p. 4 (S.D.N.Y. 2001)(arrest photographs admissible to corroborate a witness's testimony).

The video proffered by defense counsel was relevant and material to the question for which it was offered, i.e. whether appellant was left-handed.  This issue was vital to the defense, as the perpetrator seen on the video of the crimes was right-handed.  Defendant had the right to present this issue to the jury, and sought to do so in a very limited way.  And the significance of this issue is demonstrated by the fact that the jury asked to handle the gun during deliberations, and it was passed among each of them to hold.  The District Court's refusal to permit this evidence was based

on a mechanistic application of the rules of evidence that deprived appellant of his fundamental Fifth and Sixth Amendment rights to due process of law, to confront his accusers, and to present a defense. We therefore urge this Court to reverse appellant's conviction and remand the matter for a new trial.

<u>POINT V</u>

APPELLANT'S CONVICTION UNDER COUNT THREE MUST BE DISMISSED BECAUSE ATTEMPTED HOBBS ACT ROBBERY, THE PREDICATE FOR THE CRIME OF DISCHARGING A FIREARM DURING A CRIME OF VIOLENCE CHARGED IN COUNT THREE, IS NOT A CRIME OF VIOLENCE.

Appellant was convicted, under count three of the indictment, of Discharging a Firearm During a Crime of Violence. The crime of violence alleged in count three was Attempted Hobbs Act Robbery as charged in count two of the indictment. Following appellant's conviction, the Supreme Court decided <u>United States</u> v. <u>Taylor</u>, 2022 WL 2203334 (2022), which found that Attempted Hobbs Act Robbery does not qualify as a crime of violence under 18 U.S.C. §924(c). This case involves the identical charges raised in <u>Taylor</u>, was raised by defense counsel in a pretrial motion to dismiss count three, and requires the same outcome as <u>Taylor</u>.

We therefore urge this Court to vacate the ten year sentence imposed under count three, and dismiss that count of the indictment.

37

<u>CONCLUSION</u>

FOR THE REASONS STATED IN POINTS I, II, AND III, ABOVE, APPELLANT'S CONVICTION SHOULD BE REVERSED, THE CONTENTS OF THE BACKPACK SUPPRESSED, AND THE MATTER REMANDED FOR A NEW TRIAL; FOR THE REASONS STATED IN POINT IV, APPELLANT'S CONVICTION SHOULD BE REVERSED AND THE MATTER REMANDED FOR A NEW TRIAL; FOR THE REASONS STATED IN POINT V, COUNT THREE SHOULD BE DISMISSED.

Respectfully submitted,

<u>s/MURRAY E. SINGER</u>
Attorney for Defendant-
Appellant

July 5, 2022

38

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REUIREMENTS
AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed.R.App.P.
   32(a)(7)(B) because this brief contains 9051 words, excluding the parts of the
   brief exempted by Fed.R.App.P. 32(f).

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5)
   and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has
   been prepared in a proportionally spaced typeface using WordPerfect X8 in
   Times New Roman font size 14.

Dated: July 5, 2022


                                        S/Murray E. Singer
                                        MURRAY E. SINGER, ESQ.
                                        Attorney for Defendant-Appellant

SPECIAL APPENDIX

## **Table of Contents**

**Page**

Judgment of the United States District Court for the Eastern
    District of New York, entered December 1, 2021,
        Appealed From ................................................................. SPA1

AO 245B (Rev. 09/19)   Rev. EDNY 2/1/2021 Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Elgin Brack | Case Number:  1:18-cr-00684-ENV-1 |
| | USM Number:  91308-053 |
| | Murray E. Singer, Esq. |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)     1-9
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| | SEE NEXT PAGE | | |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/1/2021
Date of Imposition of Judgment

*/s/Eric N. Vitaliano*

Signature of Judge

Eric N. Vitaliano, U.S.D.J
Name and Title of Judge

12/1/2021
Date

**SPA2**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

| | | | Judgment—Page | 2 | of | 8 |

DEFENDANT: Elgin Brack
CASE NUMBER: 1:18-cr-00684-ENV-1

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1951(a) | Hobbs Act Robbery Conspiracy | 11/26/2018 | 1 |
| 18 USC § 1951(a) | Hobbs Act Robbery Conspiracy | 11/26/2018 | 2 |
| 18 USC§§924(c)(1)(A)(i) | Possessing, Brandishing and Discharging a Firearm | 11/26/2018 | 3 |
| 924(c)(1)(A)(ii), | During a Crime of Violence | | |
| 924(c)(1)(A)(iii) | 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(ii), and 924(c | | |
| 18 U.S.C. § 1951(a) | Hobbs Act Robbery | 11/26/2018 | 4, 6 and 8 |
| 18 U.S.C. § 1951(a) | Possessing and Brandishing Firearms During Crimes | 11/26/2018 | 5, 7 and 9 |
| 18 USC §§ 924(c)(1)(A) | of Violence | | |
| (i) and 924(c)(1)(A)(ii) | | | |

AO 245B (Rev. 09/19)  Judgment in Criminal Case
    Sheet 2 — Imprisonment

Judgment — Page    3    of    8

DEFENDANT:  Elgin Brack
CASE NUMBER:  1:18-cr-00684-ENV-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of:
One hundred forty four (144) months custody on counts 1, 2, 4, 6, 8, to run concurrent to each other. One hundred twenty (120)
months custody on count 3, to run consecutive to the sentences imposed on Counts 1, 2, 4, 5, 6, 7, 8, and 9. Eighty Four (84)
months of custody on counts 5, 7 and 9 on each count, to run consecutive to the sentences imposed on each other and Counts
1, 2, 3, 4, 6, and 8.

☑ The court makes the following recommendations to the Bureau of Prisons:
    The Court recommends the defendant be placed in a facility near New York City.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at   _____ ☐ a.m. ☐ p.m.   on   _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on   _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on   _____   to   _____

at   _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page _____4_____ of _____8_____

DEFENDANT:   Elgin Brack
CASE NUMBER:   1:18-cr-00684-ENV-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 Years on counts 1, 2, 4, 6, 8.
3 Years on count 3.
3 Years on counts Counts 5, 7, and 9.
EACH TERM OF SUPERVISION TO RUN CONCURRENTLY.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you
      pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT: Elgin Brack
CASE NUMBER:  1:18-cr-00684-ENV-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

**SPA6**

AO 245B (Rev. 09/19)      Judgment in a Criminal Case
                         Sheet 3D — Supervised Release

_____
                                                    Judgment—Page ___6___ of ___8___

DEFENDANT:  Elgin Brack
CASE NUMBER:  1:18-cr-00684-ENV-1

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall comply with the restitution order.

2. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of his/her financial dealings and shall provide truthful monthly statements of his/her income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to his financial information and records.

3. The defendant shall not associate in person, through mail, electronic mail, the internet, social media, telephone, or any other means with any victim of the instant offense.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
   Sheet 5 — Criminal Monetary Penalties

| | | | Judgment — Page | 7 | of | 8 |

DEFENDANT: Elgin Brack
CASE NUMBER: 1:18-cr-00684-ENV-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment\*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $ 900.00 | $ 1,264,536.86 | $ 0.00 | $ 0.00 | $ 0.00 |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| Sedgwick Claims Management Services | $1,264,536.86 | $1,264,536.86 | 100 |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 1,264,536.86 | $ 1,264,536.86 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑   the interest requirement is waived for the   ☐ fine   ☑ restitution.

    ☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  Elgin Brack
CASE NUMBER:  1:18-cr-00684-ENV-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☐  Lump sum payment of $ _____ due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☑  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☑ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:
      Special Assessment fee of $900.00 is due immediately. An order of restitution in the amount of $1,264,536.86, due
      immediately and payable at a rate of $25 per quarter while in custody, and at a rate of 10% of gross monthly
      income while on supervised release. Payment should be submitted to the Clerk of the Court, U.S. District Court for
      the Eastern District of New York, 225 Cadman Plaza East, Brooklyn, NY 11201.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| Scott Brack(2)  18cr684 | 1,264,536.86 | 1,264,536.86 | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    SEE ATTACHED ORDER OF FORFEITURE

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.